May I please the Court, I represent the state's legislative leaders and I will present on standing in the Section 2 Proportionality Inquiry and then turn the podium to my colleagues to address other issues. I'll begin with jurisdiction. The District Court erred in imposing a statewide injunction against all districts in two plans challenged by just four individual plaintiffs. It is well established that a voter has standing to challenge only the district where that voter resides. The District Court was therefore obligated to discern which districts individual plaintiffs reside in, determine whether they are cracked or packed, and then limit its adjudication to those districts. If liability were found, it had to restrict its injunction to those districts. Here the Court found that individual plaintiffs resided in three House districts, only two of which it found to be cracked or packed, and it failed to restrict its adjudication to those districts and instead enjoined two full redistricting plans, including the Senate plan, which was not challenged by an individual plaintiff. The plaintiffs appear to admit that the injunction is overbroad and they are clear that they did not ask for it, but they still defend it under two theories that are legally incorrect. First, the plaintiffs contend that individuals have standing to challenge not only their own districts, but also districts in the near vicinity. That theory was rejected as long ago as United States against Hayes in 1995, where voters residing in Louisiana's 5th Congressional District contended that the 4th Congressional District, which was adjacent, had legal infirmities and that it would benefit them to redraw that because it would result in the reconfiguration of their adjacent district. The Supreme Court rejected that argument and held that any infirmity in the 4th Congressional District would be experienced only by voters in the 4th Congressional District, not in the 5th Congressional District. So to hear a voter or a member of an organization in a district that is adjacent to one alleged to be legally infirm has no standing to challenge the adjacent district. But isn't the problem that, okay, so this is one district and this is the other district and those need to be changed. Well, then if this one's changed, it's going to affect this one, right? That's true. So how can you possibly change this one if this one's out the window? The proposition is true, Your Honor, but it conflates injury and remedy in a way that Gill v. Whitford directly addressed in the clearest terms. And what Gill said was just because the neighboring district needs to be changed as an incidental matter at the remedy phase does not mean that it can be adjudicated in its own right. A district can be legally infirm in its own right. Well, the district judge said it should go back to Congress to, to the Louisiana Congress to address these issues and redo the ones that were found to be improper. It did not say every single one has to be redone. But because there was so much la-la-la-la-la along the board, it, that's why the court did that. And why wouldn't that make sense? Let's assume, arguendo, that the district court was correct on that. I'm not saying yes or no on that, but let's, for the moment, that there is this, this, this and this, why wouldn't that be sent back to Congress to work it out? The process of sending it back to the legislature is not what we're challenging. We're challenging the injunction itself as to any district that lacks a voter and that was not found to be cracked or packed. Just because the legislature has the opportunity to remedy a deficiency that may have been found does not mean that there's a justification for the injunction in the first instance and certainly not for the scope of this injunction. So that's not really what's carrying the water here. I'm just struggling a little bit about, if we assume again, arguendo, that at least part of what the district court found was truly a problem, then how does the 2022 plan go into effect when there's this changing around? The same way, this is, this is actually not an unusual problem. The plaintiffs cited a case in their brief where this happened and the way it worked, it was called Bethune Hill versus the Virginia State Board of Elections. There were twelve districts, twelve plaintiffs, they each resided in the district. The court found legal infirmities in eleven and joined eleven and it listed in its order that those eleven were enjoined and that meant that elections could not occur in those districts during the pendency of the injunction. When it got to the remedy phase, the court ended up having to draw the map and it changed, I believe, 22 to 25 districts based on the phenomenon that we had been discussing. But that didn't mean elections needed to be enjoined in those neighboring districts during the process. Here we actually have a very real problem in Louisiana today because there are two districts where there are vacancies right now and the plaintiffs have to, and those districts are not districts where a plaintiff reside or even a member of a plaintiff resides. And the plaintiffs have taken the position in a filing on Friday that the injunction, based on its plain terms, enjoins elections in those districts, including special elections. That issue will be resolved by the district court, but the point is, there's no basis to enjoin an election in a neighboring district. That's the problem in United States v. Hayes. Gill v. Whitford addresses that at length. This case, if the injunction is to go anywhere in this case and not be significantly curtailed to just a few districts, it has to be based on the entity plaintiff's diversion of resources theory, which was rejected by the Hippocratic Medicine case just last term. The Supreme Court held, it rejected the notion that standing exists when an entity diverts its resources in response to a defendant's actions. That's what the two entity plaintiffs are contending here. They're saying that their activities are more expensive or less effective than they might be under different redistricting plans. But the whole point of Hippocratic Medicine is that an organization cannot establish standing simply based on the intensity of its interest. And by spending money towards its goals, which is a laudable thing, it can't just create standing. Otherwise, any entity could spend money related to elections, challenge a redistricting plan. Stepping back, it's a startling prospect that an entity would have standing that is greater than the standing that an individual has. As we've been discussing, an individual can only challenge that individual's own district. What the plaintiffs are proposing here is actually unprecedented. I'm not aware of any vote dilution case ever that proceeded on the basis of a diversion of resources theory. None has been cited to me in this case. And Haven's, excuse me, Hippocratic Medicine warned against extending Haven's Realty beyond its context. This would be a gross extension and has not warned it. I see that I am out of time. Unless the Court has further questions, I will cede the podium. Okay. You've saved a little time for rebuttal. Thank you. We'll hear from Philip Strach. Strach. Like a K. Strach. Oh. Like a K on the end. Okay. Good morning. Good morning. May it please the Court. Phil Strach for the Louisiana Secretary of State. I'm going to focus mostly on some merits issues, particularly the jingles factors and a couple other related merits issues. And I'm going to focus primarily on jingles one and the requirement under the law that the Court has defined that the black population is geographically compact. And our contention in this case is that the Court basically ignored that. The Court clearly looked at the compactness of the district shapes, but that's not enough under jingles and its progeny. In fact, the Court devoted an entire section of the opinion to the shapes, the district shape compactness, and also credited the plaintiff's expert, Mr. Cooper, who said that considering population compactness was, quote, not necessary to answer the jingles one question. Well, that's just flat out wrong. Jingles one requires a look at population compactness. And even the plaintiffs concede, they give lip service to the population compactness requirement, but they and the Court did not actually follow that. This Court in Sensely v. Albritton affirmed this population compactness. There, the plaintiffs on appeal made the same argument here that shape alone was the relevant test, and this Court flatly rejected that in the Sensely case. The Court reaffirmed prior case Houston, noting that while compactness shouldn't hinge on the shape of a district, it's part of the inquiry, but it's not the entire inquiry. And the Court found where districts were drawn with black populations in towns that were 15 to 18 miles apart to create additional majority-minority districts, that that was too dispersed. That was stitching together dispersed minority populations, and the Court found that was not enough. Of course, the U.S. Supreme Court has emphasized this requirement in Bush v. Vera. The Court, Justice Kavanaugh and Alan v. Milligan, just recently emphasized this requirement. So it's very clear that population compactness is a thing. It's just not something that can be ignored, and it can't just be subsumed into the inquiry about the compactness of the shape of the district. As the Court knows from reading the briefs, the measures that folks typically use to measure the compactness of the shape of a district are REAC and Polsby-Popper. Those are very well known, but they only look at the shape, the outline of the district. They do not look at and they cannot measure the dispersion of the populations within the  district. The defendants actually did an analysis and had an expert testify about that very issue. Our expert used a measure called moment of inertia, which is a statistical measure that dates back to maybe the 60s to 70s. It's been used very rarely in redistricting cases, but it was used here. It's a very well-known statistical concept, and what our expert found was that multiple House and Senate districts that the plaintiffs drew in their illustrative plans connected dispersed black populations. So for instance, their House District 23 connected black populations in Mansfield from other black populations like 48 miles from Natchitoches, 42 miles from Campde, 27.5 miles from Edgefield. Illustrative Senate District 17 connected black voters in New Roads and Plaquemine, 43.6 miles apart. Illustrative House District 60 connected black populations in Gonzalez, White Council, and Plaquemine, up to 30 miles away. Frankly, in a district that would require you to traverse the Mississippi River to get from one side of it to the other. Our contention is that these findings simply cannot be squared with sensibly Bush, Allen, and other precedents from this circuit and the U.S. Supreme Court, and the fact that the judge sort of wholly accepted Mr. Cooper's statement that, well, population compactness is not relevant to what I'm doing, we think highlights the error that the court made. So at a minimum, the case should be remanded for the court to retry the case and make more fulsome findings on an issue that is clearly very important to this court and to the U.S. Supreme Court. What evidence was presented other than Dr. Trendy's analysis in opposition? On the issue of population compactness, Your Honor, none. None. So the plaintiffs presented evidence on REOC, Poulsby, Popper, that those go to the lines, the compactness of the lines. They made no attempt to do any analysis of the dispersed geographic populations within the districts they drew, none. Mr. Trendy, who's now thankfully Dr. Trendy, he got his Ph.D. last year, he offered the only evidence on this issue, and it was the moment of inertia of statistic, and it was also, he did what are called dot plot maps and chloropleth maps, which he used to show the dispersion of the black populations and how Mr. Cooper basically stitched them together in the same way that the black populations and sensely were stitched together miles apart, which this court held was not sufficient. So you're essentially complaining about the district court's decision to discount Dr. Trendy's testimony? We think that was error, Your Honor, but it doesn't matter because the district court made no effort whatsoever even outside of Dr. Trendy's analysis to analyze the dispersion of the black populations within these districts, none. The district court basically used the compactness of the lines, Riach and Polsby-Popper, as a proxy for that, and it's clear that under Sensely and the U.S. Supreme Court precedent that is not sufficient. The district court made no attempt to fulsomely analyze that particular issue. We think that's a real problem with the opinion. Another significant problem, Your Honors, with the opinion, and this is just sort of a practical thing, this case was tried, I think, in November 2023. There was an election for legislative districts in October, November or maybe November, December of that year. We asked the judge to delay the trial so that what are called endogenous elections could be looked at in the trial. In other words, you're about to have an election for legislative districts under the very maps that are being challenged, why don't you just wait a few months, have a trial in February or whatever, so that we can actually analyze the polarization levels in districts, because those elections were going forward. It's not like we were asking . . . Yeah, but that's one thing that we really defer to district courts on is deciding when to set the trial. What is your best case for the proposition that that's a reversible point? Your Honor, I would cite to you the West Wego Citizens for Better Government case, where the court remanded there for consideration of endogenous elections, which is very similar to what we were asking for here. It would have been very easy, and I get it, the trial court gets to dictate the trial calendar, but the next legislative elections aren't coming up until 2027. This was 2023. The trial could have been delayed a few months to permit analysis of those highly relevant, probably the most relevant election data that you could have in a case like this, and the court just simply refused to do it. We think under West Wego that's error. We think it's reversible error, and of course, now the data is available. If this court were to remand for a new trial, that data is available, and this court could have a record that would actually permit it to look at the polarization levels under the districts at issue in the actual seats that are issued. Now, the plaintiffs say that, well, we did look at endogenous elections, but the endogenous elections that they submitted were from the prior decade, so it was basically stale census data, so that's no good. The absolute best data to look at would have been from the 23 elections for the legislature, and all it took was just a two or three month delay in the trial to permit analysis of those results. We think that that's an error that this court should correct and can easily correct. Then finally, Your Honor, I just want to make a point about proportionality. Obviously, under the VRA, strict proportionality is not required. The judge's injunction in this particular case would require extra proportionality. It would require the state to draw more majority-minority districts than are warranted by the population. The black VAP voting age population in Louisiana is about 31%. It would require much more than that, and of course, under Johnson v. DeGrande, the U.S. Supreme Court simply said you have to have substantial proportionality. You don't need strict proportionality. You certainly don't need extra proportionality. Under the maps that were drawn in 2022, there was substantial proportionality, and the judge didn't really wrestle with that fact. We think that that is enough to reverse the minimum to remand and have the judge take another look at, well, what exactly are you doing here? How many districts are you ordering them to draw, and is that going to give one group extra proportionality over other groups, and is that what the U.S. Supreme Court requires? The answer is no. I see my time is up. I've reserved a few minutes for rebuttal. Thank you, Your Honor. Thank you. We'll turn to Morgan Brungard. Did I get it right? Oh, great. I finally got one right. Go for it. Judge Haynes, and may it please the court, my name is Morgan Brungard, and I'm here on behalf of the state of Louisiana. As we explained in our briefing, the state joins the arguments that the court just heard from my colleagues, Mr. Riley and Mr. Strack. In addition to those arguments, we have raised two discreet, dispositive issues that we believe warrant reversal. The first is that Section 2 of the Voting Rights Act has no private right of action. Now, of course, Robinson forecloses that argument at this stage. And so today, I focus my comments on the second issue, that applying Section 2 to the state of Louisiana is no longer constitutional. The court has just heard a lot this morning about the nuances of proportionality, the jingles conditions, and other Section 2 issues. I'd like to zoom out to current voting conditions in Louisiana. For 14 years, in 2006 and again in 2020, black Louisianans have voted more than white Louisianans. In 2006, 69% of black voters over 63% of white voters cast ballots. This comes from Table B in Shelby County, the website for which we provided in our briefing. In 2020, for voters with bachelor's degrees, 76 of black voters over 74% of white voters cast ballots. And for voters with high school diplomas, 46% of black voters over 30% of white voters cast ballots. So, in 2006, we have 69% black to 63% white. In 2020, 76% black to 74% white for college-educated voters and 46% black to 30% white for those with high school diplomas. This comes from plaintiff's own evidence at ROA-19759. Now let's zoom back in on the particulars of the 15th Amendment and VRA Section 2. The 15th Amendment gives Congress the power to pass, quote, appropriate legislation to enforce the prohibition on intentionally discriminatory voting practices. In 1966, Kozenbach established the framework for evaluating the appropriateness of the not otherwise appropriate unless justified by exceptional conditions. In 2013, Shelby County established the relevant question here. The court said the question is whether the act's extraordinary measures, like Section 2, continue to satisfy constitutional requirements. So the requirements are exceptional and extraordinary conditions. Going back to Kozenbach in 1966, all the way through Shelby County in 2013, the Supreme Court has looked for wide racial disparities in things like voter registration or voter turnout at the time of the constitutional challenge, not the statutory enactment, to find conditions sufficiently exceptional or extraordinary. Something in the order of a 50-point disparity like in Kozenbach is needed. In that case, roughly 30 percent of black voters were registering versus 80 percent of white voters. Now by 2006, when Congress reauthorized Section 5 of the VRA, the needle had moved significantly. The data no longer needed to look at voter registration rates. The question had become voter turnout, and in Louisiana, as I just explained, 69 percent of black voters to 63 percent of white voters were casting ballots. In 2013, the Supreme Court in Shelby County reviewed those 2006 statistics and held that there was no denying at that point that the conditions that originally justified those measures no longer characterized voting in Louisiana and the other covered jurisdictions. The 2020 turnout numbers that I cited at the top of my argument exceed the numbers that the court found insufficient, insufficiently exceptional in 2013 to continue to justify Section 5. Now, Section 2, for its part, rests on congressional findings from 1982, over 40 years ago. If Congress had made updated findings since then, it would find the turnout data I just used, like I said, on the 2006 data in Shelby County that was not sufficiently exceptional. Now add the unrebutted expert testimony that any current polarization that may exist is political, not racial. That's at ROA 11319 to 27. And it is clear that vote dilution claims in Louisiana are no longer justified by current conditions and so no longer constitutional. For these reasons, we ask the court to reverse and hold Section 2 unconstitutional as applied to Louisiana. Thank you. Thank you. And you did not save time for rebuttal, but thank you. All right, we'll turn to the appellees. We'll begin with Megan Keenan. Yes, Your Honor. Oops. Okay. Good morning, Your Honors. Megan Keenan from the ACLU on behalf of the appellees. May it please the court. The district court did not err in finding that the legislative maps that Louisiana passed in 2022 violated Section 2 of the Voting Rights Act. Following a seven-day trial involving almost two dozen witnesses, the district court found that Louisiana's state legislative plans packed and cracked black communities in specific areas of the state in a way that prevents them from electing a candidate of their choice. Under the totality of circumstances, the court found Louisiana's House and Senate maps provide those black voters with less opportunity than other Louisianians to elect representation that is responsive to their needs. All right, but what about this argument that there certainly are areas of Louisiana that wouldn't be changed, even assuming arguendo that the district court was correct? Why do they all have to be enjoined? What is your response to that discussion? Yes, Your Honor. So it starts with the point that you made about the remedy toward the start of the legislative intervener's arguments. Once the court found that there was dilution in the district where the plaintiffs lived, the reality is that the legislature will have to pass a new plan, or the court will ultimately have to impose a new plan if the legislature is not able to do so. The 2022 plan cannot go into effect. And we see this is not an uncommon feature of redistricting cases. For example, take Milligan, the Supreme Court's recent 2023 case. In the underlying district court decision, the Section 2 plaintiffs proved that one could provide black voters with an opportunity to elect candidates of their choice, but remedying the violation in that district ultimately required redrawing four of the state's seven congressional districts, including districts where no Section 2 plaintiff lived. Even though not all of those districts ultimately ended up being redrawn, just as here, the Alabama court, whose decision was affirmed by the Supreme Court in Milligan, took the same approach of enjoining the entire plan and affording the state an opportunity to enact a new map first. You can see that at Singleton, at 582 F sub 3rd, at 935 to 37, and 1033 to 1034. Milligan's not the only case. There's also one from the Eastern District of Wisconsin. That's Balduce at 849 F sub 2nd, at 861. So again, this is not unique, and it squares with what Your Honor was pointing out about the fact that a new map will need to ultimately be implemented. And so from there, I'll turn. But what about this fact that, oh, now there's a situation where they need to have an election. Why can't they do it under this? Because it's not the arena that was challenged. Yes, Your Honor. So first, as the other side referenced, we've now briefed this issue at ECF 287 in the district court. Our position is that the order currently prevents the state from filling those vacancies, but that provides an incomplete picture of the entire briefing as we put it forward. First, the district court has given the legislature an opportunity to pass a new map so that it could fill those vacancies on a lawful map. We believe that the best way to square those vacancies with the district court's injunction is to expedite that process to create a lawful map so that the vacancies are being filled under maps that comply with Section 2. However, we've acknowledged that if that's not feasible, of course, the public interest supports filling those vacancies. We've agreed that if there's no way to expedite that remedial process, that a limited stay of the injunction so that those vacancies can be filled would be proper. That's in our briefing at ECF 287 in the district court. From there, I'll turn to the merits of this case. I'll start with each of the three jingles preconditions and then proceed to the totality of the circumstances as the district court did here. To start with the first jingles precondition, the legal test for satisfying that standard is clear. Plaintiffs must show that the minority group is sufficiently large and geographically compact to constitute a majority in a reasonably configured district. That's been the case in decisions from Jingles itself through Milligan. And in those cases, courts have routinely assessed Jingles 1 by evaluating whether the proposed majority-minority districts in plaintiff's illustrative maps are reasonably configured as measured by traditional redistricting factors. That's exactly what the court did here. And the Supreme Court's decision in Milligan confirms the district court properly assessed Jingles 1. Here, the district court considered and credited the same kinds of evidence of the same traditional redistricting factors from the same expert whose conclusions the Supreme Court recently affirmed as, quote, highly credible and, quote, working hard to give equal weight to all traditional redistricting criteria. That's from Milligan at 599, U.S. at 34. Here, the district court spent 41 pages going through the Jingles 1 evidence in this case and found that the black population is sufficiently large and compact to constitute a majority in three additional majority black districts in the Senate and six additional majority black districts in the House. In making those findings, the court made findings about the districts, not just the plan as a whole. It listed each of those districts and where it appeared in the illustrative map. It visually depicted each majority black district in the opinion. It also provided statistics about the population of each of those districts to show numerosity. And it walked through some of the most egregious examples of packing and cracking that occurred in those same places in the enacted map. The court also credited Mr. Cooper's testimony that the districts in the illustrative plan were contiguous, that their shapes were reasonable, and that the mathematical compactness scores were similar across both the enacted and the illustrative plan in this case. Critically, the court also credited the testimony of Dr. Colton, who is an expert in the historic geography of Louisiana. Dr. Colton provided evidence about how the additional majority black illustrative districts respect communities of interest better than the corresponding districts in the enacted plan. That includes black communities of interest in Bossier and Caddo Parish, black communities in Natchitoches, DeSoto, and Red River Parishes, black communities in Lake Charles, black communities in Jefferson Parish, and black communities in Baton Rouge. And the district court found that Mr. Cooper, in drawing the plans, adhered to traditional redistricting factors, including the Louisiana legislature's own criteria set out in Joint Rule 21. With all of those findings of support, the court ultimately found that Mr. Cooper determined three additional reasonably configured majority black districts could be created in the Senate and six in the House. She found Mr. Cooper's testimony credible and persuasive, his methodology sound, and the resulting conclusions reliable. That was a proper application of Jingles 1. And I do briefly want to address the point that Judge Ramirez raised earlier in the argument. The court did consider Dr. Trendy's testimony. It didn't exclude it. It just found that it was unhelpful because it was divorced from the Jingles 1 standard as courts have consistently applied it, including most recently in Milligan. That was not reversible error. From there, I'll turn to Jingles 2 and 3, which are frequently addressed in tandem. Those preconditions require plaintiffs to show that black voters vote cohesively and that white voters would vote cohesively to defeat black preferred candidates in the enacted plan. In finding that each of those preconditions was present, the court credited the expert in testimony and analysis of Dr. Lisa Hanley, a political scientist with 35 years of experience as a voting rights and redistricting expert. Dr. Hanley analyzed election results in three different ways to show that those preconditions were present here. First, she looked at the results of statewide elections in the specific areas of the state where we sought to prove dilution. Second, she looked at prior state legislative races in those same areas. And third, she conducted a recompiled elections analysis that matched the borders of the new majority black illustrative districts and the corresponding enacted districts based on precinct-level data from prior elections. All of those analyses overwhelmingly pointed to the same conclusion. Black voters are highly cohesive in support of their preferred candidates and blocks of white voters have been consistently successful in defeating black preferred candidates, including in the areas of interest in this case and in the recompiled election results that look to the specific borders of the enacted plan in this case. Based on that testimony and evidence, the district court did not commit clear error in crediting Dr. Hanley and concluding that jingles two and three were satisfied here. From there, I'll turn to the totality of the circumstances, which is where the district court went after it found that each of the three jingles-free conditions was satisfied. Those totality of the circumstances are measured in large part by what the court has called the Senate factors or the Zimmer factors. And as to those factors, the court found that plaintiffs put on largely unrebutted evidence that supported the district court's findings that under the totality of the circumstances, black Louisiana voters have less opportunity than other members of the electorate to participate in the political process and elect representatives of their choice. The testimony and evidence that plaintiffs put on as to the totality of circumstances properly reflects both historical and current conditions, both statewide and locally in the areas of the state that are at issue. In addition to the historical evidence where courts have repeatedly found there is no sincere dispute of discrimination in Louisiana, the district court repeatedly credited testimony and record evidence showing that black voters lack equal access now to elect the candidates of their choice in Louisiana based on current political and socioeconomic conditions that exist in present day. And as the district court found, defendants did not meaningfully contest any of these Senate factors evidence at trial. I want to take some time to highlight a few examples of the recent and current evidence that support a finding of vote dilution in this case. The court found that Senate factor two supports the plaintiffs based on Dr. Handley's and Dr. King's demonstration of the continued existence of racially polarized voting in recent elections between 2015 and 2022. The district court found that Senate factor seven supports plaintiffs based on Dr. Birch's and Representative Glover's demonstration of the extremely limited extent to which black Louisianians have been elected to office outside of majority black districts, just as the Mississippi District Court recently found in a similar section two case. The court found that Senate factor five supports plaintiffs based on Mr. Cooper's explanation that the most recent census data shows racial disparities, including in areas such as education, employment, income, housing, health, and more. And those disparities existed at the statewide, parish, and municipal level in all of the new majority black districts introduced in the illustrative House and Senate plans. You can see that at pages 15832 to 15855, 19952 to 24069 of the record. This is extensive evidence. In addition to those disparities, Dr. Birch's testimony and evidence directly linked those effects of discrimination to the depressed political participation of black voters, which the court credited. And Senate factor eight supports plaintiffs based on, among other things, the many individual stories in the challenge districts about official significant lack of responsiveness to black voters' particularized needs. As just one example, Pastor Harris testified that in his lifetime, the black community in Natchitoches had spent 30 years asking their elected officials to help fix the horrible conditions of their community's roads, with no response. In 2011, that changed when for the first time, Natchitoches was drawn into a majority black House district. Black voters then elected the candidate of their choice, and he helped them to get the money needed to fix those roads. Pastor Harris was in tears when he recounted this at trial. He testified that his community began to believe again that the political process could work, and it could work for them too. And then in 2022, in the plan we're currently challenging, the legislature dismantled that majority black district. That is the type of dilution that violates the Voting Rights Act, and it's the type of evidence that explains why the district court's credibility findings about the evidence introduced at trial should be afforded great weight. I do want to briefly address standing, which I understand the legislative interveners challenged in this case. Before you get to standing. Sure. Talk about Senate Factor IX. Yes. What did the court point to in the record in concluding that this factor weighed in favor of plaintiffs, and if it did not point to anything in the record, what was in the record? Yes. So Dr. Birch's testimony is what the district court cited and what was put on at trial, also in Dr. Birch's report, which was admitted into evidence. Dr. Birch examined the legislative records in this case, and she concluded that the rationales that were provided by the members were not supported by the record. You can find the details on that in her report, which is at page 19751 to 19813 of the record. I know she also testified about tenuousness in the record at 9867 to 9935. I believe it's toward the end of her trial testimony. And the court also considered testimony from one of the legislators himself and found that it did not disturb Dr. Birch's conclusions about the tenuousness of the conclusions. So now I'll take a moment to address standing. First, I want to be clear that the parties agree about the standard required to prove standing in this case. A vote dilution burden arises through a voter's placement in a cracked or packed district, and voters in those cracked and packed districts have standing to challenge the district in which they reside. That's the standard we cite from this court's decision in Harding v. Dallas County, and the legislative interveners agree with that standard at page 2 of their reply brief. That is what each of the individual plaintiffs in this case established, and it is the same theory upon which the associational plaintiff standing, which wasn't mentioned at all in the legislative intervener's presentation, is premised. I want to address the district court's factual findings about the individual plaintiffs and the identified NAACP members living in packed or cracked districts. The district court made a factual finding that each individual plaintiff is a black registered voter. That's at page 9130 of the record, and it also found, I'm quoting here, each individual plaintiff currently lives in a packed or cracked district in the enacted map and would live in a majority black district in the illustrative plan. That's at 9214 of the record. But you're not contending, I understand the notion that somebody here might influence somebody right next door, in a different district but next door, but not way up, you know, New Orleans doesn't impact Shreveport. Absolutely. We've never contested that point in this case. Here, we've proved the delusion in each of the districts where the plaintiffs live that will require reconfiguring certain other districts, and ultimately the legislature may choose to alter districts in areas in other parts of the states to comply with other traditional redistricting factors. In purposes of this appeal, the remedy, and particularly which districts will be altered and how many additional majority black districts will be in the ultimate plan, isn't at issue in this appeal. It's important to be clear about what the injunction does and doesn't do in this case. Nothing in the injunction adopts plaintiff's illustrative plan as the remedial plan in this case. And in fact, the remedial hearing is currently set in this case for August of 2025. Both of the parties still have an opportunity to submit remedial plans in May of 2025. So the court hasn't made any order about which districts have to be changed. The only thing it found is that the plaintiffs proved vote delusion in their districts, that the plan itself will have to be enjoined so the legislature can take the first crack at redrawing the map. That is entirely consistent with this court's past instruction that the legislature has to take the first crack at drawing the map after a finding of delusion. But it wasn't enough for her to just have the individuals. They needed the entities that are challenged, but that you all contend represent other people in other areas of Louisiana. So there are two sets of plaintiffs that get us all of the relief that we need in this case. The first is the individual plaintiffs. There are four of those. The second is the NAACP's associational standing based on the identified members that they proved lived in specific districts in Louisiana. There are other plaintiffs in this case, but the court does not need to address their standing, including any diversion of resources standing, in order to find that the relief ordered was appropriate in this case because the individual and associational standing gets us the full set of relief that we asked for. I do want to address as to the associational standing the district court's factual finding. The court described the identified Louisiana NAACP members as, quote, black registered voters whose votes are diluted in the districts in which they vote and thus have standing in their own right. That's at page 9214 of the record on appeal, and a similar finding exists at 9132. Because the court made those findings, the question on appeal is whether the evidence plausibly supports those findings, and it does. As you can see in the reports of Mr. Cooper and Dr. Handley, which show the packed and cracked nature of each of the districts and the fact that the majority black illustrative districts that each of the plaintiffs would be drawn into were effective to give them an opportunity to elect candidates of their choice. I do want to address the- Can I turn to another question, which is the argument that the appellants are making that Section 2's race-based redistricting mandate is unconstitutional as applied to Louisiana? What's your best argument against that? Yes, so to start, I will answer your question directly in just a moment, but because the United States has intervened to address the constitutionality, we will defer to them on most of the answers. I do want to take a moment to address your question. Our best evidence in this case comes from Shelby County itself, where the Supreme Court described Section 2 as, quote, a permanent nationwide ban on racial discrimination in voting. Shelby County makes clear there's no need for this court to impose an arbitrary and artificial expiration date because Section 2 will sunset on its own whenever current conditions no longer allow plaintiffs to satisfy the Jingles framework. Milligan makes that clear, too. As the Supreme Court recently recognized in that case, Jingles 1 will become harder to satisfy as residential segregation decreases. Likewise, Jingles 2 and 3 will become harder to satisfy as society becomes less racially polarized. And as I've discussed, the totality of the circumstances analysis turns not just on historical conditions but on present conditions in Louisiana. If those don't exist, a Section 2 claim can't be made out. The problem with the state's argument here is that even though those things may be declining in some locations to make satisfaction of a Section 2 claim impossible, the district court expressly found that is not the case in Louisiana based on extensive evidence about not just the history but the current conditions of voting access in Louisiana. I do want to take a moment to address the point about the timing of the trial. First, in the only case that the Secretary cites in its brief where a district court scheduling decision was found to be highly prejudicial based on the trial dates, the complaint in that case was filed on May 24th. Six days later, on May 30th, the judge notified the parties that it, quote, I plan to hear both the final merits and the preliminary injunction six days later, on June 5th. That is nowhere near comparable to the proceedings in this case. The timing here was well within the district court's discretion to manage its own docket. And I do want to speak to West Wego, the case that Mr. Strack mentioned up here as well, because even the cases like West Wego, the defendant's site, lend support to the argument that the district court's decision not to wait for the data from the 2023 legislative elections was not an abuse of discretion. When the West Wego case challenging the city's aldermanic redistricting first went to trial, no black candidate had ever run for alderman. When the district court concluded that the lack of endogenous elections precluded a finding of vote dilution, this court reversed that decision. It concluded that the plaintiff could make out its claim of vote dilution based solely on exogenous elections, and it remanded for further proceedings to allow the plaintiff to do that. That's not this case. In this case here, there was plenty of evidence. Dr. Hanley analyzed 21 state legislative elections, which are endogenous for the opposite issue in this case. There was plenty of evidence on which the district court could make its findings, and the district court didn't abuse its discretion in setting the trial date in this case. I have just a brief note to wrap up here, Your Honors, unless the court has further questions. Milligan and Jingles provide a consistent description of what Section 2 guards against. Quote, the essence of a Section 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters. Those are precisely the conditions that the district court found were present in the areas of the state where the plaintiffs challenged dilution. For those reasons, this court should affirm. I'd like to thank the court for the time today, and also I'd like to acknowledge the plaintiffs who traveled down here to be in the courtroom with us, Dr. Nairn, Dr. Washington, and the Louisiana NAACP's president, Mr. McClanahan. Thank you so much for your time. All right. Thank you. And we'll hear from the U.S. Good morning. May it please the court, Noah Bokat-Lindell for the United States. The United States intervened in this case to defend the constitutionality of Section 2 of the Voting Rights Act, and that is the issue on which I will be focusing this morning. We take no position on the merits. During this litigation, the state has shifted between three constitutional arguments. I'd like to quickly run through them for clarity and then address some of the points that have come up during this morning's discussion and in some of the briefing. First, the state made a race versus party argument. The state asserted that to prove white block voting under the third jingles precondition, Section 2 plaintiffs would have to prove that racially polarized voting among voters in Louisiana was due to racial bias rather than politics. And the state then asserted that Section 2 could not be constitutionally applied where partisanship caused racially polarized voting. Now, the district court understood the state to have been focused on this race versus party argument below, but as the district court recognized, both Supreme Court precedent and this court's precedent preclude that argument, and the state has dropped that argument on appeal. Second is a continuous legislative updating argument. The state has claimed that Section 2 cannot be applied today because Congress has not made new findings to justify the statute's continued application. The state makes this continuous legislative updating argument on appeal, but it did not make this argument below until its post-trial brief. And last is a statewide carve-out argument. The state claims that current conditions now provide equal opportunity for black voters in Louisiana, and so the state should get a blanket constitutional exemption from Section 2. Though the state did not even hint at this statewide carve-out argument until the eve of trial, and spent only two pages of its opening brief in this court on the issue, in its reply brief, the state said that this is its main claim, and that has been most of the focus of its argument here this morning. So if I can, I'd like to start there with this statewide carve-out argument. The most fundamental problem with that argument is that it is simply a repackaging of the state's merits argument and a rehashing of its disagreement with the factual findings that the district court made to show that under the totality of circumstances, there is not equality of opportunity for black voters in Louisiana. To the extent that they are attempting to make an additional argument based on 2020 turnout statistics, as the state was pointing to this morning, this first of all shows why that argument, to the extent it's anything different from the totality of circumstances statutory standard in the case, should be deemed waived, because these are new factual arguments that are being made, and the United States did not have the opportunity to enter factual evidence. As to the 2020 turnout statistics, for example, they're speaking to gerrymandered statistics about a couple of the education levels, the actual full statistics from the Census Bureau showed that in 2020, black voter turnout was significantly lower than white voter turnout in Louisiana. It was 57.2% for black voters versus 61.8% for white voters. And in the endogenous elections here, the state legislative elections, data from the State Secretary of State's office showed that the 2019 October elections turnout was 50% for white registered voters versus 40.4% for black registered voters. And in the October 2023 election, in data that was available from the Secretary of State before trial in this case, it was 41.6% turnout for white registered voters versus only 28.8% for black voters. More fundamentally as a legal matter here, this is not really a recognizable form of an as-applied constitutional argument. States cannot simply get a carve-out from a generally applicable statute that sets standards for case-by-case adjudication to determine whether the current conditions in a state render the political process equally open. It's the same as if a state were to come into court in an American with Disabilities Act case or a Family Medical Leave Act case and say, well, we have not been discriminating against people with disabilities or women for the past 5 or 10 years, therefore we should be constitutionally exempt from a statute where Congress had found a pattern of discrimination. That's not a viable as-applied claim. Any viable as-applied claim would have had to ask for a change in the legal standards that have been used for the past 40 years under Section 2. The problem with that is that Milligan rejected any such argument. It rejected a number of those sorts of arguments from Alabama, including the same race versus party argument that the state was making below, and that's why the state had to shift its arguments on appeal because the principal argument it was making below was rejected in Milligan. If I could, I'd like to just turn briefly to the continuous legislative updating argument, this idea that Congress needed to create new findings. First of all, Shelby County, which the state relied on heavily this morning, expressly said nothing in this opinion in any way affects Section 2. So on its face, the Supreme Court said that that case did not apply to Section 2. The bigger problem for the state is that, as Ms. Keenan pointed out, Section 2B already bakes in any sort of current conditions standard. Section 2B requires a determination based on the totality of circumstances whether there is equal opportunity in the jurisdiction. So the statute itself already requires a look at current conditions. So your opponent thinks that Milligan is not foreclosing this issue, but you think it is? We think that the— The issue as applied to Louisiana. Right. So they're relying on basically two sentences of Justice Kavanaugh's concurring opinion. In Milligan, Justice Kavanaugh, of course, joined the section of the opinion that upheld Section 2's constitutionality, and in his concurrence, Justice Kavanaugh was merely pointing out that the dissent had brought up this other temporal argument but that it had not been briefed in the case, and so he would not deal with that argument. But again, the statute itself bakes in a consideration of current conditions. So if this were actually being determined on the merits, which it was not in Milligan, Section 2 would survive any sort of scrutiny. Their argument for continuous legislative updating also imposes a number of practical problems. It's a separation of powers issue to effectively require Congress to sunset statutes unless it updates legislative findings, and because the state is bringing this as an as-applied challenge, saying facts have changed in Louisiana, it would require Congress to create legislative findings for all 50 states, not to mention the thousands of jurisdictions, local jurisdictions, that are subject to the Voting Rights Act, and then update them however long. The state doesn't say how often they would have to be updated. It would also eviscerate stare decisis, because this court has upheld the constitutionality of Section 2 as recently as in Vesey, and of course the Supreme Court just upheld it in Milligan. But it would allow litigants to come back into court and continually challenge the constitutionality of statutes based on recent data that they claim means that the legislative findings are no longer current enough. Okay. Your time has expired. Thank you. All right. We'll go to the—we have two of you all doing rebuttals. We'll start with the first one. Thank you, Your Honor. A couple points here. First off, you heard my friend, Ms. Keenan, say that there are cases issuing statewide injunctions. She has mischaracterized Baldus in that case. The Eastern District of Wisconsin identified two districts, 8 and 9, and said specifically, this holding is not intended to affect any other district drawn by Act 43. That's at 859 of the Federal Reporter. The Singleton decision that she mentioned went to the Supreme Court. Jurisdiction was not raised. We don't know what the arguments would have been or how that would have worked. The cases are legion that say a court is not entitled to disregard binding clear precedent on a jurisdictional issue like Gill v. Whitford in favor of a case that did not actually address jurisdiction. Milligan did not address that issue. As to Senate Districts 32 and Senate Districts 14 that are at issue presently in the state, I appreciate that the plaintiffs are willing to be reasonable to permit special elections, but there's a more fundamental problem here, which is that a federal court does not have power to act in those districts to enjoin elections at all. We should not need a stay. We should not need consent. There shouldn't be a court injunction there, period. We agree on the standard. We don't agree on how it's being applied here. Only the plaintiffs in House District 25 and House District 60 have standing in our view because the plaintiffs in House District 66 were not found to live in a cracked or packed district. At pages 27 through 33 of the district court's opinion, it actually makes the findings concerning packing and cracking and it makes a list of districts that are found to be cracked or packed. Sixty-six is not among them and it couldn't be because according to plaintiffs' own experts, it couldn't be redrawn as an opportunity. Thank you. Thank you. And we're down to our last rebuttal from Philip Strack. Strack. Yes, Your Honor. Last but not least. I got it right this time. Go ahead. Let me just address a couple of points from the government's argument on the constitutional question. I did just want to point out that it's black-letter law, that race-based remedies that are permanent are unconstitutional in their own right. That's from Grutter. Some other cases, Northwest Austin, which is a VRA case. I think that's important. I also think it's important to point out the state has not shifted its constitutional argument. I would point the court to pages five through seven of the state's reply brief. I would also point the court to the defendant's pretrial brief at Record 7046 and 6999-92, where the state and the defendants have raised this as-applied constitutional question, the constitutional issue many times. Finally, Your Honor, on the Jingles I population compactness issue, I think what the plaintiffs are doing here and what the district court did is they are conflating the reasonable configuration requirement with population compactness. They're using the reasonable configuration requirement to basically X out the population compactness requirement. Well, if we look at the shape of the lines and we look at this, that, and the other, then that's enough. Know that the courts have made it clear, and Justice Kavanaugh made it clear in his recent concurrence in Allen v. Milligan, that there are two separate requirements. The fact of the matter is that the district court just made no effort to grapple with that aside from rejecting the testimony of Dr. Trendy. The court made no effort to try to do that. Finally, on this issue of the totality of the circumstances, again, I just want to reemphasize proportionality because I think that's an issue . . . if the plaintiffs get what the court has apparently ordered in this case, then they will get 35 . . . then the black population will have 35% of the house district and 35.9% of the senate districts, where the black population, the voting age population is right at a little above 31%. There's no court that ever has held that that was proper. In fact, under Johnson v. DeGrande, the court actually says all you need is rough proportionality, which would mean something in the 26, 27, 28% range, which is what the 2022 current map is, would be sufficient. I think it would be reversible error to . . . even if the judgment is somehow affirmed, but to allow a remedy to be imposed that provides extra proportionality, I think, would be a real problem and one that I think that the court should keep in mind. My time is up. All right. Thank you, everyone. I appreciate all the arguments. This case is now under submission, and we are done for today. We will be back tomorrow at 9 a.m. Thank you.